ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2009 JUL -7 PM 3: 25

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TRUK INTERNATIONAL FUND LP, | § | |
| Plaintiff, | § § § | NO. 4:09-CV-308-A |
| v. | § § | |
| DAVID W. WEHLMANN, CANO PETROLEUM, INC., S. JEFFREY JOHNSON, MORRIS B. SMITH, BEN DAITCH, MICHAEL J. RICKETTS, PATRICK McKINNEY, RANDALL BOYD, DONALD W. NIEMIEC, ROBERT L. GAUDIN, WILLIAM O. POWELL, III, CANACCORD ADAMS, INC., and CANACCORD CAPITAL CORPORATION, | § § § § § § § § § § § § | |
| Defendants. | § § | |

## (CORRECTED STYLE) AMENDED COMPLAINT - CLASS ACTION

Plaintiff Truk International Fund LP ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and presentations and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cano Petroleum, Inc. ("Cano" or the "Company"), and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action lawsuit brought on behalf of a class (the "Class") consisting of all persons who purchased the common stock of Cano Petroleum, Inc. ("Cano" or the "Company") in Cano's June 26, 2008 secondary public offering of 7 million shares of Cano

common stock at $8 per share (the "Offering"), issued pursuant to a registration statement and prospectus filed with the SEC, to recover damages caused by defendants' violations of the federal securities laws arising from material misrepresentations and misstatements of fact in the registration statement and prospectus. Excluded from the Class are the defendants, members of their immediate families, Cano and any officer or director of Cano.

2.    This Amended Class Action Complaint (the "Complaint") alleges violations by defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") stemming from material misrepresentations and misstatements of fact in the registration statement and prospectus pursuant to which defendants issued and sold shares in the Offering to the Class – specifically, in a registration statement and prospectus on Form S-3 filed on or about December 13, 2007 and declared effective by the SEC on December 28, 2007 (the "Registration Statement"), a preliminary prospectus supplement filed on or about June 25, 2008 on Form 424B3 (the "Preliminary Prospectus"), and a final prospectus supplement filed with the SEC on or about June 26, 2008 on Form 424B5 (the "Prospectus") (collectively, the "Offering Documents").

3.    Cano is an independent oil and natural gas company that, as further detailed herein, focuses on enhanced oil recovery (EOR) techniques to increase oil production and oil reserves at its properties.  One of the most important metrics for evaluating and valuing oil and natural gas companies is the amount of "proved reserves" of oil and gas in such companies' properties.

4.    The Offering Documents stated that Cano's proved reserves were 66.7 million barrels of oil equivalent ("BOE"), primarily stemming from four properties:  (1) the Panhandle (35.547 million BOE); (2) Desdemona (11.851 million BOE); (3) New Mexico (9.112 million BOE); and (4) Pantwist (6.829 million BOE).

5.    The Offering Documents' representations concerning Cano's proved reserves were materially misstated and false.  On July 23, 2008, approximately one month after the June 26, 2008 Offering, defendants admitted that:

      (a)     Cano's total proved reserves were not 66.7 million BOE, but rather 53.2 million BOE (*i.e.*, the Offering Documents overstated Cano's total proved reserves by 25.4%, or 13.5 million BOE);

      (b)     Proved reserves in Cano's Panhandle property were not 35.547 million BOE but 30.1 million BOE (*i.e.*, the Offering Documents overstated Panhandle proved reserves by 18.1%, or 5.447 million BOE);

      (c)     Proved reserves in Cano's Desdemona property were not 11.851 million BOE but rather 4.0 million BOE (*i.e.*, the Offering Documents overstated Desdemona proved reserves by 196.2%, or 7.851 million BOE); and

      (d)     Proved reserves in Cano's Pantwist property were not 6.829 million BOE but rather 2.4 million BOE (*i.e.*, the Offering Documents overstated Pantwist proved reserves by 185.4%, or 4.429 million BOE).

      6.     In sum, the Offering Documents: (1) overstated Cano's proved reserves in three of its four major properties (Panhandle, Desdemona and Pantwist) by a total of 17.73 million BOE; and (2) understated proved reserves by a smaller amount in the fourth major property (New Mexico) by 4.4 million BOE, resulting in a net 13.5 million BOE overstatement of Cano's total proved reserves. The table below summarizes Cano's proved reserves as stated in the Offering Documents and as restated, reduced and corrected shortly after the Offering:

### Cano's Overstatements of Proved Reserves
#### (all figures in MBOE)[1]

| Property | Per the Prospectus | Correct | Over-Statement |
|---|---|---|---|
| Panhandle | 35,547 | 30,100 | 5,447 |
| Desdemona | 11,851 | 4,000 | 7,851 |
| New Mexico | 9,112 | 13,500 | - |
| Pantwist | 6,829 | 2,400 | 4,429 |
| Nowata | 1,687 | 1,500 | 187 |
| Davenport | 1,488 | 1,600 | - |
| Corsicana | 206 | 100 | 106 |
| Total | 66,720 | 53, 200 | 13,520 |

7.    The Offering Documents purported to contain various warnings as to proved reserves generally and the proved reserve figures stated in the Prospectus. For example, the Prospectus stated that estimates of proved reserves such as those stated in the Offering Documents could vary (1) over time, and (2) from the figures provided in the Offering Documents (Prospectus, p. 9). Additionally, the Prospectus stated that:

> *Our proved undeveloped reserves may decline in response to recent Securities and Exchange Commission guidance.*
>
> This prospectus incorporates by reference estimates of our proved reserves as of the fiscal year ended June 30, 2007. Based on recent guidance regarding the appropriate method for calculating proved undeveloped reserves provided in publicly available comment letters issued by the Securities and Exchange Commission to certain companies, currently, we expect that our proved undeveloped reserves for the fiscal year ending June 30, 2008 may decrease. (Prospectus at p. S-7) (underlining added).

8.    The above statements were themselves inadequate and misleading. It was not merely the case that Cano's proved reserves *could* vary (an empty truism), or "*may* decline in response to recent [SEC] guidance" (emphasis added). Rather, Defendants knew or should have

---

[1]    MBOE is an industry acronym standing for thousands ("M") of barrels of oil equivalent ("BOE").

known, but did not disclose, that Cano's proved reserves were, at the time of the Offering, *materially less* than the reserve figures contained in the Offering Documents:

(a)    In Cano's Desdemona property, with a purported 11.851 million BOE of proved reserves, the lion's share of purported proved reserves (11 million BOE) consisted of natural gas from the Barnett Shale. Unbeknownst to Plaintiff and the Class, Cano's stated 11 million BOE of Barnett Shale gas reserves resulted in large part from the practice of booking, in *addition* to the gas found in an actually-drilled well, like amounts of gas from *eight additional, adjacent 'theoretical' wells that could be drilled.* However, *nearly one year prior to the Offering*, in July *2007*, the SEC ruled that proved reserves in the Barnett Shale could only be booked *for two such adjacent wells, rather than eight.* Defendants therefore knew, long prior to the Offering, that the proved reserve figures stated in the Offering Documents for Desdemona (and therefore Cano as a whole) were highly overstated. Defendants knew not merely that reserves could "vary" or "may decline" from the figures provided in the Offering Documents, but rather that reserves in fact were far lower than stated in the Prospectus, and would in fact materially decline when reported almost immediately after the offering (Cano's new reserve report was to be dated as of June 30, 2008 – just four days after the offering). One month after the Offering, defendants admitted the foregoing, materially reducing Desdemona's proved reserves from 11.851 million BOE to only 4 million BOE. The largest part of that 7.851 million reduction – 6 million BOE – resulted from Cano's belated recalculation of reserves in response to year-old SEC guidance to book reserves from only two rather than eight offset locations.

(b)    In Cano's Panhandle property, with a purported 35.547 million BOE of proved reserves, approximately 30.1 million BOE stemmed from a geological formation known as the Brown Dolomite and the remaining purported 5 million BOE from a distinct and separate geological formation known as the Granite Wash. Although Cano's operations in the Panhandle had focused exclusively on Brown Dolomite areas, unbeknownst to Plaintiff and the Class the proved reserve figures that Defendants provided in the Offering Documents included 5 million BOE from the

Granite Wash – in the absence of operations or any operational data for the latter formation. Relevant regulations, industry standard practice, and even Cano's stated standards for booking proved reserves only allow the booking of proved reserves in distinct, physically separate formations (here, the Granite Wash) only where there is "certainty that there is continuity of production from the existing productive formation"and only when "actual tests in the area and in the same reservoir" so demonstrate.[2]  Here, Cano's lack of operations in and operational data from the Granite Wash formation made it clear, or should have made it clear, to Defendants *ab initio*, long before the Offering, that the 5 million BOE of purported proved reserves claimed for the Granite Wash formation, were without basis in fact, and violated long-standing regulatory standards as well as Cano's own purported standards for booking proved reserves.  Therefore, Defendants knew or absent negligence should have known not merely that reserves could "vary" or "may decline" from the figures provided in the Offering Documents, but rather that reserves in fact were far lower than stated in the Prospectus.  One month after the Offering, defendants belatedly so admitted, materially reducing Panhandle proved reserves from 35.547 million BOE to only 30.1 million BOE, with the effective entirety of the 5.4 million BOE reduction arising from the erasure of "proved" reserves from the Granite Wash formation.

        (c)     In Cano's Pantwist property, of the purported 6.3 million BOE of ostensibly proved reserves, 4.95 million BOE were proved *undeveloped* reserves.  Analogously to ¶ 8(b) *supra*, these proved undeveloped reserves violated long-extant regulatory standards as well as Cano's own purported standards for booking proved reserves.  Defendants themselves had long stated that they had no near-term intention to develop claimed proved reserves in Pantwist to actually-producing sites, and in the months prior to the Offering Defendants became aware that Cano's capital expenditures would have to be constrained to more promising properties both in the short term and the longer term.  Put simply, Defendants knew and/or become aware prior to the Offering that Cano

---

[2]     *See* http://www.sec.gov/divisions/corpfin/guidance/cfoilgasinterps.htm (regulatory standards) and ¶ 50 *infra* (Cano's stated standards).

could and would do nothing with Pantwist for the foreseeable future – which meant that claiming proved undeveloped reserves for the property was contrary to regulatory standards and Cano's stated standards. Therefore, prior to the Offering, Defendants knew or absent negligence should have known not merely that reserves could "vary" or "may decline" from the figures they provided in the Offering Documents, but rather that reserves in fact were far lower than stated in the Prospectus. One month after the Offering, defendants belatedly so admitted, reducing Pantwist proved reserves from 6.3 million BOE to only 2.4 million BOE – with the effective entirety of the 4 million BOE reduction arising from the erasure of almost all of Pantwist's purported proved undeveloped reserves. Defendants also then revealed that rather than spend the funds to develop Pantwist, they would instead seek to sell off Pantwist to raise funds to develop other properties.

9.    As a result of the Offering Documents' overstatement of Cano's proved reserves, the Offering was completed at an inflated price of $8 per share. When Cano admitted one month after the Offering, on July 23, 2008, its correct and lower proved reserves, Cano's share price declined sharply and immediately, falling to close at $3.73 per share on July 24, 2008, and thereafter continued to decline. On the day Plaintiff commenced this action, October 2, 2008, Cano shares closed trading at the price of $1.84 per share – 77% lower than the Offering Price of $8 per share.

## JURISDICTION

10.    The claims alleged herein arise under the strict liability provisions §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1337, and 1367.

11.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. §§ 1391(b) and (c). Substantial acts in furtherance of the wrongs alleged and/or their effects – including the preparation and dissemination to the investing public of materially false and misleading statements, including the overstatement of proved reserves in the Offering Documents – have occurred within this District, and Cano maintains its principal executive

7

offices in this District at 801 Cherry Street, Suite 3200, Fort Worth, Texas 76102, where Cano's corporate operations are directed and managed.

12.    In connection with the acts and omissions alleged in this complaint, all of the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff Truk International Fund LP purchased shares of Cano common stock in the Offering, as detailed in the certification it previously provided (attached as Exhibit A hereto) in connection with its December 8, 2008 motion to be appointed as Lead Plaintiff.

14.    Cano Petroleum, Inc. ("Cano") is a Delaware corporation with principal executive offices at 801 Cherry Street, Suite 3200, Fort Worth, Texas 76102.   Cano is an independent oil and natural gas company that, as further detailed herein, focuses on enhanced oil recovery (EOR) techniques to increase oil production and oil reserves at its properties.  Cano's stock is traded on the American Stock Exchange under the ticker symbol CFW.

15.    Defendant S. Jeffrey Johnson ("Johnson") served as Cano's Chief Executive Officer and Chairman of the Board at all times since June 2004.  Defendant Johnson signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

16.    Defendant Morris B. Smith ("Smith") served as Cano's Chief Financial Officer and Senior Vice President from June 2006 until June 23, 2008 – three days prior to the Offering.  Defendant Smith signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

17.    Defendant Ben Daitch ("Daitch") served as Cano's Chief Financial Officer and Senior Vice President since June 24, 2008.

18.    Defendant Michael J. Ricketts ("Ricketts") served as Cano's Principal

Accounting Officer and Vice President since May 2004. Defendant Ricketts signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

19.     Defendant Patrick McKinney ("McKinney ") served as Cano's Senior Vice President of Engineering and Operations since November 2006.

20.     Defendants Johnson, Smith, Daitch, Ricketts, and McKinney are collectively referred to as the "Officer Defendants." Each of the Officer Defendants, because of their management positions and Board of Directors positions, had the power and authority to control the contents of the Offering Documents and to cause Cano to engage in the conduct complained of herein. By reason of their positions as officers and/or directors of Cano, the Officer Defendants were at all relevant times controlling persons of Cano within the meaning of Section 15 of the Securities Act, and any acts attributed to Cano were caused and/or influenced by the Officer Defendants by virtue of their domination and control thereof.

21.     Defendant David W. Wehlmann ("Wehlmann") served as a Director on Cano's Board of Directors at all times since December 12, 2007. Defendant Wehlman signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

22.     Defendant Randall Boyd ("Boyd") served as a Director on Cano's Board of Directors at all times since October 2004. Defendant Boyd signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

23.     Defendant Donald W. Niemiec ("Niemiec") served as a Director on Cano's Board of Directors at all times since March 2007. Defendant Niemiec signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

24.     Defendant Robert L. Gaudin ("Gaudin") served as a Director on Cano's Board

of Directors at all times since March 2007. Defendant Gaudin signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

25.     Defendant William O. Powell, III ("Powell") served as a Director on Cano's Board of Directors at all times since March 2007. Defendant Powell signed the registration statement for the Offering, which contained material misrepresentations and misstatements of fact concerning Cano's proved reserves.

26.     Defendants Johnson, Wehlmann, Boyd, Niemiec, Gaudin, and Powell are referred to herein as the "Director Defendants." Each of the Director Defendants signed the registration statement for the Offering, and had the power and authority to control the contents of the Offering Documents and to cause Cano to engage in the conduct complained of herein. By reason of their positions as officers and/or directors of Cano, the Director Defendants were at all relevant times controlling persons of Cano within the meaning of Section 15 of the Securities Act, and any acts attributed to Cano were caused and/or influenced by the Director Defendants by virtue of their domination and control thereof.

27.     Defendant Canaccord Adams, Inc., a Canadian corporation with operations in Toronto, London, Boston, Vancouver, New York, Calgary, Montreal, San Francisco, Houston and Barbados, is the international capital markets division of Canaccord Capital Inc. Canaccord Adams served as an underwriter of the Offering.

28.     Defendant Canaccord Capital Corporation, a Canadian corporation, is a wholly-owned subsidiary of Canaccord Capital Inc. Canaccord Capital Corporation served as an underwriter of the Offering.

29.     Defendants Canaccord Adams, Inc. and Canaccord Capital Corporation are referred to collectively as "Canaccord" and as the "Underwriter Defendants." The Underwriter Defendants were involved in the preparation of the Offering Documents and the sale of the shares issued pursuant to the Offering Documents, and as such are liable parties under the Securities Act.

The Underwriter Defendants received approximately $1.75 million in fees as a result of their work in the Offering.

30.     Each of the defendants owed to the purchasers of Cano stock in the Offering, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents. This duty included performing an appropriate investigation to ensure that the statements contained therein were true. As herein alleged, each of the defendants violated these specific duties and obligations. As a result of these violations, the price of the Cano common stock issued and sold in the Offering was artificially inflated, causing injury to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased Cano's common stock in Cano's June 26, 2008 secondary public offering of 7 million shares of Cano common stock at $8 per share (the "Offering"), issued pursuant to a registration statement and prospectus filed with the SEC, to recover damages caused by defendants' violations of the federal securities laws arising from material misrepresentations and misstatements of fact in the registration statement and prospectus. Excluded from the Class are the defendants, members of their immediate families, Cano and any officer or director of Cano.

32.     The Class is so numerous that joinder of all members is impracticable. Seven million shares of Cano common stock were issued and sold in the Offering pursuant to the Offering Documents. There are believed to be thousands of persons who purchased Cano common stock in the Offering.

33.     Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and all members of the Class sustained damages arising out of defendants' conduct in violation of federal law as complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the

11

Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

35.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

36.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class:

(a)    Whether the provisions of the Securities Act were violated by defendants' acts and conduct as alleged herein;

(b)    Whether the Offering Documents filed with the SEC in connection with the Offering contained misstatements and/or omissions of material fact;

(c)    Whether each of the defendants had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, but failed to do so;

(d)    Whether the price of the Cano shares issued and sold in the Offering pursuant to the Offering Documents was artificially inflated due to the material misstatements complained of herein; and

(e)    Whether the members of the Class have sustained damages and, if so, the appropriate measure thereof.

## FACTUAL ALLEGATIONS

**A.    Background: The Nature of Cano's Business and of Proved Reserves**

37.    **Enhanced Oil Recovery**. Cano, headquartered in Fort Worth, Texas, is an

independent oil and natural gas company. Cano's particular focus – as further explained herein – focuses on *enhanced* oil recovery ("EOR") using *secondary* and *tertiary* recovery methods:

(a)    In *primary* oil recovery/production, the natural pressure of the oil reservoir drives crude oil and natural gas to the surface or wellbore (aided often by surface or sub-surface pumps and, less often, by fracturing of the reservoir rock). It is estimated that primary production recovers only approximately 10%-30% of the 'original oil in place' (referred to as "OOIP").

(b)    In *secondary* oil recovery, the oil reservoir is artificially re-pressurized – most often by injecting large amounts of water into the oil-producing geologic formation (a "waterflood"), or by analogous injection of gases such as carbon dioxide – in order to force further crude oil and gas to the surface.

(c)    In *tertiary* recovery, chemical products are added alongside secondary recovery methods, so as not only to re-pressurize the producing formation (secondary recovery) but so as to also improve oil displacement/flow in the reservoir and thereby recover yet more oil and gas. The principal tertiary recovery method is the use of "alkaline-surfactant-polymer" technology (referred to as "ASP"): the alkaline surfactant acts like a soap in reducing interfacial rock tension (to put it crudely, it makes the rock more slippery), and the polymer aids fluid mobility by reducing viscosity.

38.    **Proved vs. Non-Proved Oil Reserves**. The primary driver of market valuations of oil/gas production companies like Cano is the amount of oil/gas reserves claimed (also known as a company's "resource base"). The most basic distinction in reserve reporting is that between "proved reserves" and unproved/non-proved reserves (also referred to, *inter alia*, as "probable reserves" and "possible reserves"). Strict SEC regulations concerning what is necessary for reserves to qualify as "proved" have endowed the *proved* reserve category with a very high degree of certainty.

39.    SEC regulations require oil/gas production companies such as Cano to report their proved reserves. SEC regulations also prohibit oil/gas production companies from reporting

13

non-proved reserves (also known as "probable" and "possible" reserves) in SEC filings. As further alleged below, defendants represented in the Offering Documents and in other public statements that Cano's proved reserves were 66.7 million barrels of oil equivalent ("BOE"). Additionally, Cano claimed a further 118 million BOE of probable and possible reserves, purportedly estimated very conservatively.

40.     **Cano's Essential Strategy**. As was stated in Cano's Form 10-K filed on September 13, 2007 (the "2007 10-K"), and in the Prospectus for the June 26, 2008 Offering (which incorporated the 2007 10-K and also repeated the below-quoted statements in substance), Cano's strategy was (1) to acquire mature U.S. oilfields that had already undergone primary production; and (2) to then implement enhanced oil recovery techniques such as waterflooding and ASP injection to recover further oil.

41.     As Cano pointed out, this strategy eliminated substantial risks usually faced by oil companies: most notably, exploration risk and geopolitical risk. Cano's oilfields, as a result of their prior primary production, had already been determined to contain proved reserves – generally, a subcategory of such reserves known as "proved undeveloped" reserves (55.4 million BOE of Cano's 66.7 million BOE of proved reserves were proved undeveloped reserves). With respect to such reserves, the oil was purportedly already known/demonstrated to exist and to be economically recoverable, but the infrastructure needed to extract/recover the oil had not yet been developed. Further, Cano's oilfields contained yet larger amounts of probable and possible reserves that, though not necessarily recoverable through primary production, could be recovered through secondary and tertiary recovery. Were Cano to develop the infrastructure for secondary/tertiary recovery on such properties (*e.g.*, water pipelines and pumps, injection wells and producer wells, oil/water separation facilities, etc.), or demonstrate oil recovery through small but real pilot projects, it could create sufficient certainty of production to transform such probable/possible reserves into proved reserves.

42.     In a nutshell, then, Cano's strategy was to convert proved undeveloped

14

reserves into proved developed reserves, and to convert probable/possible reserves into proved reserves. Both ends were accomplished through developing the oil properties, or pilot sites on the properties, so as to implement secondary/tertiary production operations and oil/gas production. Thus, as Cano's development progressed – as it installed the necessary infrastructure for waterflooding and ASP injection, as it began injecting water and waiting for sufficient injection so as to re-pressurize the oil formation and start forcing out further oil, etc. – and as oil began to be produced, oil production would be demonstrated with sufficient certainty so as to allow Cano's proved reserves to *increase*.

   43. As Cano's 2007 10-K and Prospectus stated:

> Cano Petroleum, Inc. [] is a growing independent oil and natural gas company. Our strategy is to acquire assets with a high ratio of non-proven or proved undeveloped reserves suitable for EOR techniques, primarily on the onshore United States for a low cost. We intend to convert these non-proven and/or proved undeveloped reserves into proved producing reserves by applying water, gas or chemical flooding and other EOR techniques. During our first three years of operations, our primary focus has been to achieve growth through acquiring interests in existing, mature fields in Texas, Oklahoma and New Mexico. We believe the portfolio of oil and natural gas properties we have acquired to date provides suitable opportunities to apply EOR techniques. As of June 30, 2007, we had proved reserves of 66,720 MBOE, of which 8,454 MBOE were proved producing, 2,843 MBOE were proved non-producing, and 55,423 MBOE were proved undeveloped.

> *****

> We believe significant acquisition opportunities will continue to exist primarily because the major energy companies and large independents continue to focus their attention and resources toward the discovery and development of large fields. During the past several years, the major companies have been divesting themselves of their mature oilfields, a trend management expects will continue. Also, the recent economics of the oil and natural gas market have improved as prices have risen substantially. These conditions provide ample opportunities for smaller independent companies to acquire and exploit mature U.S. fields...

> Our Strategy

> • Acquire Strategic Assets. We seek to acquire low-cost assets with a high ratio of non-proven or proved undeveloped reserves suitable for waterflood and EOR techniques, primarily in the onshore United States. We believe we have acquired an attractive portfolio of assets to implement our business plan. We will continue to selectively target potential acquisition candidates in a disciplined manner, which involves being financially prudent and acquiring assets that meet our engineering and operational standards. We focus on U.S. operations. Accordingly, we are not subject to geopolitical uncertainties, dependence on foreign sources and other issues related to overseas operations.

15

• No Exploration Risk. Our portfolio is comprised of mature fields with proven reserves, existing infrastructure and abundant technical information. Accordingly, our production growth is not dependent on exploration drilling and the high degree of speculation in making new discoveries.

• Exploit and Develop Existing Properties. We intend to add proved reserves to, and increase production from, our existing properties through the application of advanced technologies, including water, gas or chemical flooding and other EOR techniques. We believe that our management team has a proven track record of exploiting underdeveloped properties to increase reserves and cash flow. (2007 10-K, pp. 1, 3)

*****

We are a growing independent oil and natural gas company that is actively pursuing waterflooding and enhanced oil recovery techniques to increase production and reserves at our existing properties and properties acquired in the future. Our primary focus is crude oil and our target acquisitions are onshore U.S. properties. Our focus on domestic, mature oil fields eliminates exploration risks and uncertainties of international sources. We use waterflooding and enhanced oil recovery methods, such as alkaline/ surfactant/ polymer technology.

During our first two years of operations through June 30, 2006, our primary focus was to achieve growth through acquiring existing, mature oil and natural gas fields. In March 2007, we acquired Permian Basin oil and natural gas properties located in New Mexico. We believe the portfolio of oil and natural gas properties that we have acquired thus far provides ample opportunities to apply our operational strategy.

As of June 30, 2007, we had proved reserves of 66,720 MBOE, of which 8,454 MBOE were proved producing, 2,843 MBOE were proved non-producing, and 55,423 MBOE were proved undeveloped.

During the fiscal year ended June 30, 2007, our primary emphasis was to achieve growth by developing our existing oil and natural gas properties through development activities such as waterflooding and EOR technology. (2007 10-K, p. 30)

44.    **Cano's Properties**.  Prior to and during the Class Period, Cano's operations proceeded on seven different properties, located in Texas, Oklahoma and New Mexico, known as (in roughly descending order of importance): (1) the Panhandle; (2) New Mexico (also referred to as "Cato", the name of the primary New Mexico field); (3) Desdemona; (4) Nowata; (5) Pantwist; (6) Davenport; and (7) Corsicana.  The graphic below (from an "Investor Presentation" created by Cano and attached as an exhibit to a Form 8-K filed with the SEC on February 21, 2008) summarizes these seven projects and the amount of proved (and probable) reserves claimed for each:

16



**B. The Offering Documents' False Representations Concerning Cano's Proved Reserves**

  45. In connection with the Offering, defendants filed a registration statement and prospectus with the SEC for the Cano shares to be issued in the Offering, made up of the following Offering Documents:

    (a) On or about December 13, 2007, defendants filed with the SEC a preliminary registration statement on Form S-3, containing a preliminary proxy prospectus. On or about December 28, 2007, the registration statement was declared to be effective by the SEC;

    (b) On or about June 25, 2008, defendants filed with the SEC a preliminary prospectus supplement to the preliminary prospectus that had been declared effective as of December 28, 2007; and

(c)    On or about June 26, 2008, defendants filed with the SEC a final prospectus supplement and prospectus for the Offering (the "Prospectus"). As the Prospectus explained, the Prospectus was "part of" the earlier-filed registration statement (Prospectus, at p. S-1).

46.    As the Prospectus explained, the SEC allows companies to make requisite disclosures through "incorporation by reference" of other, previously-filed documents containing such requisite information. The information contained in documents "incorporated by reference" becomes, through incorporation by reference, part of the registration statement itself, as the Prospectus stated:

> The SEC allows us to "incorporate by reference" the information we have filed with it, which means that we can disclose important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus supplement... (Prospectus, at p. S-2)

47.    Specifically, the Prospectus incorporated by reference, *inter alia*, the following documents:

(a)    Cano's Form 10-K filed on September 11, 2007 (the "2007 10-K");

(b)    Cano's Forms 10-Q filed with the SEC on November 7, 2007 (the "Q1 2008 10-Q"), February 8, 2008 (the "Q2 2008 10-Q"), and May 8, 2008 (the "Q3 2008 10-Q"); and

(c)    Cano's Forms 8-K filed with the SEC on February 21, 2008.[3]

**1.    Representations**

48.    The driving factor in market valuation of oil/gas companies is the amount of a company's "proved reserves" of oil and gas (as further defined below). Indeed, the first paragraph of the Prospectus' section titled "Our Business" contained one set of figures – Cano's proved reserves of 66.7 million barrels of oil:

As of June 30, 2007, we had proved reserves of 66,720 MBOE[4], of which 8,454

---

[3]    Cano filed two Forms 8-K on that day and explicitly incorporated both of them. The Prospectus also incorporated numerous other Form 8-K filings (and specifically refused to incorporate certain prior Form 8-K filings).

[4]    "MBOE" is an acronym that stand for thousands of Barrels of Oil Equivalent (*i.e.*, measuring both oil and gas in terms of units defined by barrels of oil).

MBOE were proved producing, 2,843 were proved non-producing, and 55,423 were proved undeveloped. (Prospectus, at S-4 and at p. 1)

49.    The Prospectus (at pp. 1-3) further detailed Cano's proved reserves at each of Cano's seven primary properties, as summarized in the following table:

### Cano Proved Reserves (MBOE)

| Property | Proved Developed Producing | Proved Developed Non-Producing | Proved Undeveloped | Total Proved Reserves |
|----------|---------------------------:|-------------------------------:|-------------------:|----------------------:|
| Panhandle | 3,397 | 0 | 32,150 | 35,547 |
| Desdemona | 711 | 1,175 | 9,965 | 11,851 |
| New Mexico | 224 | 624 | 8,265 | 9,112 |
| Pantwist | 1,883 | 0 | 4,946 | 6,829 |
| Nowata | 1,687 | 0 | 0 | 1,687 |
| Davenport | 552 | 936 | 0 | 1,488 |
| Corsicana | 0 | 98 | 107 | 206 |
| Total | 8,454 | 2,843 | 55,422 | 66,720 |

50.    The Prospectus defined the terms "proved reserves", "proved developed reserves", and "proved undeveloped reserves" – following regulatory definitions and standards – as follows:

"PROVED RESERVES." The estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with **reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions**.

"PROVED DEVELOPED RESERVES." The oil and natural gas reserves that can be expected to be recovered **through existing wells with existing equipment and operating methods. Additional oil and natural gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery should be included as "proved developed reserves" only after testing by a pilot project or after the operation of an installed program has confirmed through production response that increased recovery will be achieved.**

"PROVED UNDEVELOPED RESERVES." The oil and natural gas reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling units offsetting productive units that are reasonably certain of production when drilled. **Proved reserves for other undrilled**

19

**units can be claimed only where it can be demonstrated with certainty that there is continuity of production from the existing productive formation. Under no circumstances should estimates for proved undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery techniques is contemplated, unless such techniques have been proved effective by actual tests in the area and in the same reservoir.** (Prospectus, p. 43) (emphasis added).

51.    Proved developed non-producing reserves are those reserves to be produced from existing wells but which are not currently producing (for example, because the oil-bearing formations or intervals are at minor depths below the bottom of the well).

52.    The above-mentioned Prospectus disclosures concerning Cano's proved reserves (*i.e.*, their amounts and their definitions) were first stated in Cano's 2007 Form 10-K, which contained identical figures for field-by-field and total proved reserves (2007 Form 10-K, pp. 1-2, 4 and 30-33) and identical statements concerning proved reserve standards (*id.*, p. 10).  For example the 2007 Form 10-K stated (at p. 4):

> Our proved oil and natural gas reserves as of June 30, 2007 have been estimated by Forrest A. Garb & Associates, Inc., independent petroleum engineers.  **As defined in the Securities and Exchange Commission rules, proved reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions**, i.e., prices and costs as of the date the estimate is made. Prices include considerations of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions. **Reservoirs are considered proved if economic productibility is supported by either actual production or conclusive formation tests. The area of a reservoir considered proved includes (A) that portion delineated by drilling and defined by gas-oil and/or oil-water contacts, if any; and (B) the immediately adjoining portions not yet drilled, but which can be reasonably judged as economically productive on the basis of available geological and engineering data**. In the absence of information on fluid contacts, the lowest known structural occurrence of hydrocarbons controls the lower proved limit of the reservoir. **Reserves which can be produced economically through application of improved recovery techniques (such as fluid injections) are included in the "proved" classification when successful testing by a pilot project, or the operations of an installed program in the reservoir, provides support for the engineering analysis on which the project or program was based**.... (2007 10-K, at p. 4) (emphasis added).

**2.    Falsity**

53.    The Prospectus statements concerning proved reserve amounts and standards

in ¶¶ 43, 47-49, *supra*, were materially false, materially overstated Cano's proved reserves at that time, and materially misrepresented the standards under which Cano claimed its reserves to be "proved."

54.     On July 23, 2008, Cano issued a press release and held a conference call with analysts and investors, in which it was disclosed that Cano's proved reserves as of June 30, 2008 (only four days after the Offering) were 53.2 million BOE – *i.e.*, 13.4 million BOE (or 20%) less than the proved reserve figure of 66.7 million BOE stated in the Prospectus.  A comparison of the proved reserves stated in the June 26, 2008 Prospectus and, one month later, in Cano's July 23, 2008 disclosures is provided below:

| Property | Prospectus Figures | July 23, 2008 Figures | Net Decline |
|----------|--------------------|-----------------------|-------------|
| Panhandle | 35,547 | 30,100 | 5,447 |
| Desdemona | 11,851 | 4,000 | 7,851 |
| New Mexico | 9,112 | 13,500 | - |
| Pantwist | 6,829 | 2,400 | 4,429 |
| Nowata | 1,687 | 1,500 | 187 |
| Property | Prospectus Figures | July 23, 2008 Figures | Net Decline |
| Davenport | 1,488 | 1,600 | - |
| Corsicana | 206 | 100 | 106 |
| Total | 66,720 | 53, 200 | 13,520 |

55.     In fact and all in all, as defendants Johnson and McKinney explained during Cano's July 23, 2008 conference call, 19.4 million BOE of reserves that had been previously stated as "proved" reserves in the Prospectus – or 29.1% of the 66.7 million BOE of proved reserves stated in the Prospectus – could not, as Cano admitted on July 23, 2008, be classified as "proved" – at least

not as of four days after the Offering.[5]

56.     As defendants Johnson and McKinney explained during Cano's July 23, 2008 conference call, the 19 million BOE overstatement of Cano's proved reserves consisted of three distinct overstatements: (1) a 5 million BOE overstatement of proved reserves in Cano's Panhandle property; (2) a 5 million BOE overstatement of proved reserves in Cano's Pantwist property; and (3) a 9 million BOE overstatement of proved reserves in Cano's Desdemona property. Matters with respect to each of these three properties and their reserves are detailed in turn below.

57.     Additionally, defendants further disclosed on July 23, 2008 that Cano's new and lower proved reserve figure (53.2 million BOE) had been provided by a different petroleum engineering firm (Miller and Lents, Ltd.) than the firm Cano had used for the prior, higher reserve figure provided in the Offering Documents (Forrest A. Garb & Associates, Inc.). Defendants simultaneously disclosed that the Miller and Lents, Ltd. firm was more recognizable to Wall Street.

58.     As a result of the Offering Documents' overstatement of Cano's proved reserves, the Offering was completed at an inflated price of $8 per share. When Cano admitted one month after the Offering, on July 23, 2008, its correct and lower proved reserves, Cano's share price declined sharply and immediately, falling to close at $3.73 per share on July 24, 2008, and thereafter continued to decline. On the day Plaintiff first commenced this litigation, October 2, 2008, Cano shares closed trading at the price of $1.84 per share -- 77% lower than the Offering Price of $8 per share.

### a.     Overstatement of Proved Reserves in the Panhandle

59.     The Prospectus stated that Cano's proved reserves in the Panhandle amounted to 35.5 million BOE. One month later, defendants admitted that proved Panhandle reserves were

---

[5]     Offsetting the *gross* demise of 19.4 million BOE of proved reserves were, *inter alia*: (1) the acquisition of new properties with 1.9 million of proved reserves; (2) the addition of 4.6 million BOE to proved reserves as a result of Cano's development activities, primarily in its New Mexico properties; and (3) a further reserve decline of 0.5 million BOE as a result of Cano's actual production during fiscal 2008 – all of which net out to a *net* overall decline of 13.4 million BOE of proved reserves.

5.4 million BOE less, or 30.1 million BOE.

60.    Cano's Panhandle properties consist of 27,000 acres that lie over several distinct oil-bearing geologic formations, including formations known as the "Brown Dolomite oil trend," the "White Dolomite oil trend," the "Granite Wash oil trend," the "Arkosic Lime oil trend" and the "Arkosic Dolomite oil trend." Cano's Panhandle operations were almost entirely focused on a distinct Panhandle area that Cano termed the "Cockrell Ranch," which sat over the Brown Dolomite oil trend. The Cockrell Ranch area was the only area of the Panhandle in which Cano had completed development of requisite facilities for waterflood operations (namely, drilling a complete pattern of injector and producer wells over the field, installing water lines for the flooding, and installing equipment to separate out the oil from the flood) and had actually commenced waterflooding. During the class period, Cano had also begun to develop other Panhandle areas, known as the "Mobil-Fee" and the "Harvey" areas, both of which sat over the same Brown Dolomite oil trend as the Cockrell Ranch area.

61.    Unbeknownst to the Class, and as defendants admitted on July 23, 2008, of the 35 million BOE of ostensibly proved reserves in the Panhandle, 5 million BOE had been claimed for the Granite Wash oil trend. Those 5 million BOE of purportedly proved reserves did not meet Cano's stated standards for proved undeveloped reserves as stated in the Prospectus (*see* ¶ 51, *supra*). The Granite Wash oil trend was a distinct and physically separate oil formation from the Brown Dolomite oil trend over which Cano's operations had exclusively focused (*i.e.*, there was no requisite "continuity of production from the existing productive formation"). Cano had not performed the requisite "actual tests in the area and in the same reservoir" – *i.e.*, in the Granite Wash – that would serve as a basis for booking proved undeveloped reserves: again, Cano's operations had exclusively been oriented to properties over the Brown Dolomite oil trend.

62.    As defendant Johnson stated in Cano's July 23, 2008 conference call:

> [O]bviously we had some reclassifications of reserves. Approximately 5 million barrels were at our Panhandle water flood that were not in the Brown Dolomite that we were flooding, there was approximately 5 million barrels in the Granite Wash that we had to reclassify to move out to probables until we start to inject in that

formation.

*****

... then obviously the other write-down of 5 million barrels out of the Granite Wash in the Panhandle that was in the waterflood was really just moved out from a PUD to a probable until we started to put water over there in the Granite Wash. We still think it's going to flood real nice and we'll have the reserves. But until there's water going in there that was pushed back to a probable.

63.     Defendants' illegitimate booking of 5 million BOE of proved reserves in the Panhandle, and their July 23, 2008 admission of the same, render materially false and misleading the proved reserve figures stated in the Prospectus (¶¶ 43, 47-49, *supra*) as well as the standards stated in the Prospectus for booking proved reserves (¶ 50, *supra*), which standards in fact were not adhered to by defendants.

### b.     Overstatement of Proved Reserves in Desdemona

64.     The Prospectus stated that Cano's proved reserves in the Desdemona property amounted to 11.9 million BOE.  One month later, defendants admitted that proved Desdemona reserves were 7.9 million BOE less – *i.e.*, only 4 million BOE.

65.     Cano's Desdemona property consists of 11,000 acres that lie over a gas-bearing geologic formation known as the "Barnett Shale."  Of the 11.9 million BOE of proved reserves claimed in the Prospectus for Desdemona, approximately 11 million BOE were from Barnett Shale gas operations and approximately 1 million BOE from waterflooding operations in a small area of the Desdemona property known as the "Duke Sand."

66.     The Barnett Shale geologic formation is known as a "tight" rock formation in which the gas is relatively trapped in dense, compact rock rather than easily flowing through veins, fractures, or other porous spaces within the rock formation.  Gas recovery from the Barnett Shale has been improved by two techniques: (1) fracturing the rock formation to improve gas flow (also known as "frac-ing"); and, of relevance here, (2) horizontal drilling.  Horizontal drilling can allow better access areas that are either difficult or impossible to access via vertical drilling, or that were bypassed by vertical drilling, and can further optimize gas recovery by better tracking available gas (*e.g.*, where a reservoir is wider horizontally than it is tall vertically, or where a formation is

24

characterized by natural vertical fractures which can better be drained of gas by a horizontal well that cuts through those fractures).

67.    The Barnett Shale is principally exploited through horizontal drilling.  As the Prospectus stated (via incorporation by reference of the 2007 10-K), after drilling 15 vertical wells to "delineate the lateral extent of the Barnett Shale formation within the roughly 11,000 acres of our Desdemona Field," Cano designed and began to implement its "Horizontal Well Development Program."  That program consisted of a planned "80 total horizontal locations...of which 76 future horizontal locations were considered for proved undeveloped reserves" and of which four horizontal wells had been drilled and completed during 2007.

68.    Unbeknownst to the Class, and as defendants admitted during Cano's July 23, 2008 conference call, of the 11 million BOE of ostensibly proved reserves in the Desdemona Barnett Shale (and 11.9 million BOE in Desdemona), 6 million BOE had resulted from defendants' practice of booking proved undeveloped reserves in *eight* additional offset locations for every horizontal well despite SEC rulings that limited such offset bookings to *two* per horizontal well (*i.e.*, defendants were booking four times as many proved undeveloped reserves than was allowed).  The effect is illustrated below:

**Recognition of Proved Undeveloped Reserves**



| New Method | Old Method |
|---|---|

Maximum 2 PUD locations per 1 PDP well    Maximum 8 PUD locations per 1 PDP well

LEGEND



Proved Developed Producing (PDP) horizontal well
Proved Undeveloped (PUD) horizontal location

25

69.     As Defendant Johnson explained during Cano's July 23, 2008 conference call:

And then approximately 6 million barrels of oil equivalent came from PUDs [proved undeveloped reserves] and that was due to an SEC ruling that they made earlier in the year that on the horizontal wells out in the Barnett Shale – used to we'd be able to book eight locations off a single horizontal well and that has been taken down to two locations.  So that was our reclassifications.

70.     The SEC ruling that Defendant Johnson referred to in Cano's July 23, 2008 conference call had in fact been made *a full year earlier, in July 2007*.  Indeed, Defendant Johnson admitted during Cano's July 23, 2008 conference call that "[w]e were expecting the write-down on the Barnett Shale."

71.     Defendants' illegitimate booking of 6 million BOE of proved reserves in the Desdemona Barnett Shale, and their July 23, 2008 admission of the same, render materially false and misleading the proved reserve figures stated in the Prospectus (¶¶ 43, 47-49, *supra*) as well as the standards stated in the Prospectus for booking proved reserves (¶ 50, *supra*), which standards in fact were not adhered to by defendants.

72.     In addition to the foregoing 6 million BOE reduction, Desdemona reserves as stated in the Prospectus were reduced by a further 3 million BOE that, as Defendant Johnson explained during Cano's July 23, 2008 conference call, was "due to performance... The EUR [Estimated Ultimate Recovery] ended up coming down."

### c.     Overstatement of Proved Reserves in Pantwist

73.     The Prospectus stated that Cano's proved reserves in its Pantwist property (9,700 acres of land slightly south of Cano's Panhandle property) amounted to 6.3 million BOE – 1.88 million BOE of proved producing reserves and 4.95 million BOE of proved undeveloped reserves.

74.     Unbeknownst to the Class, and as defendants admitted during Cano's July 23, 2008 conference call, of the 6.3 million BOE of ostensibly proved reserves in Pantwist (and, more specifically, of the 4.95 million BOE of proved undeveloped reserves), the lion's share – approximately 4.4 million BOE – had resulted from defendants' illegitimate practice of booking as

26

proved undeveloped reserves reserves that defendants were not going to actually develop in any reasonable time period.

75.    However, the Prospectus stated (via incorporation by reference of the 2007 Form 10-K), that Cano's plan was to develop a waterflood operation for Pantwist: "We anticipate implementation of waterflood injection operations during 2011 and 2012 calendar years" (2007 Form 10-K, p. 32).

76.    However, at the time of the Offering and the issuance of the Prospectus, the above-identified statement ("We anticipate implementation of waterflood injection operations during 2011 and 2012 calendar years") and the booking of at least 4.4 million BOE of proved undeveloped reserves for Pantwist, were materially false.  In fact, the capital expenditure needs of Cano's more promising projects (i.e., Panhandle, New Mexico, etc.) and Cano's constraints on funding capital expenditures made it effectively certain that Cano could not spare funds to develop the "proved undeveloped" reserves claimed for Pantwist in the Prospectus.  Defendants so admitted on July 23, 2008, disclosing that they had no intention of devoting scarce capital to develop Pantwist and that, moreover, they had decided to sell Pantwist in order to raise needed capital for more promising properties:

> We had approximately 5 million barrels at our Pantwist field was reclassified, primarily because we were looking to potentially divest that asset right now, take the capital and redeploy it into our core areas which is Cato and the water flood of Panhandle
>
> *****
>
> We were anticipating some write-down in reserves and, of course, once we decided to look at divesting of the Pantwist, those were going to come off either way. If there wasn't going to be any capital we were going to sell the assets...

77.    Without reasonable certainty that the proved undeveloped reserves claimed for Pantwist would actually be produced in the foreseeable future, such reserves could not and did not qualify as proved reserves. Defendants' illegitimate booking of 4.4 million BOE of proved reserves in the Pantwist property, and their July 23, 2008 admission of the same, render materially false and misleading the proved reserve figures stated in the Prospectus (¶¶ 43, 47-49, *supra*) as well as the standards stated in the Prospectus for booking proved reserves (¶ 50, *supra*), which standards

in fact were not adhered to by defendants.

## FIRST CLAIM
### For Violation of Section 11 of the Securities Act of 1933
### Against Cano, the Officer Defendants, the Director Defendants,
### and the Underwriter Defendants

78.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

79.    This cause of action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons or entities who purchased Cano common stock in the Offering pursuant to the Offering Documents.    Plaintiff brings this claim against Cano, the Officer Defendants, the Director Defendants, and the Underwriter Defendants.

80.    As alleged above, the Offering Documents contained material misrepresentations and misstatements of fact concerning Cano's proved reserves and omitted to state material facts necessary to make the statements contained therein not misleading.

81.    All defendants named in this Count owed to the acquirers of the stock, including Plaintiff and the other members of the Class who purchased Cano common stock in the Offering pursuant to the Offering Documents, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

82.    All of the defendants named in this Count: (i) signed the Offering Documents; (ii) were directors or officers of Cano at the time the Offering Documents were filed with the SEC; and/or (iii) served as underwriters for the offering. Further, none of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for believing that the statements contained in the Offering Documents were true and devoid of any misstatements or omissions of material fact. Therefore, each of the defendants named in this Count is liable to Plaintiff and the other members of the Class, who purchased Cano common stock in the Offering pursuant

to the Offering Documents, for the various misstatements and omissions contained therein, under §11 of the Securities Act.

83. Cano was the registrant for the shares issued to Plaintiff and other members of the Class in the Offering pursuant to the Offering Documents. Cano, as registrant, issued, caused to be issued and participated in the issuance of the materially false and misleading written statements to the investing public contained in the Offering Documents. As an issuer of the shares, Cano is strictly liable to Plaintiff and the Class for the material misstatements or omissions contained in the Offering Documents.

84. The Director Defendants and Defendants Smith and Ricketts signed the Offering Documents, either personally or through an attorney-in-fact. Each of the Officer Defendants was a director and/or senior executive of Cano at the time the Prospectus became effective.

85. Plaintiff and Class members acquired shares of Cano pursuant to, or traceable to, the Offering Documents, and did not know of untrue statements or of omissions of material facts therein.

86. By reason of the conduct alleged herein, each defendant named in this Count violated § 11 of the Securities Act. As a direct and proximate result of defendants' conduct, Plaintiff and the other members of the Class have sustained substantial damage in connection with the purchase of the common stock issued in the Offering pursuant to the Offering Documents. The Cano shares issued pursuant to the Offering Documents were issued and sold at the price $8.00 per share. When the material misstatements in the Offering Documents were later corrected, Cano's share price declined materially and sharply. By October 2, 2008, when Plaintiff filed the first suit against defendants asserting claims under the Securities Act, Cano shares had fallen to $1.84 per share.

87. Less than one year elapsed from the times of the violations and facts upon which this complaint is based to the time of filing this action. Less than three years elapsed from (a) the time that Cano stock was *bona fide* issued to Plaintiff and Class members pursuant to the

Offering Documents, to (b) the time of filing this action. Plaintiff and the Class did not know of or discover, and could not have known of or discovered with reasonable diligence, the misstatements and omissions complained of herein, until July 22, 2008.

## SECOND CLAIM
### For Violation of Section 12(a)(2) of the Securities Act of 1933
### Against Cano, Defendant Johnson, Defendant Smith,
### Defendant Ricketts, and the Underwriter Defendants

88.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

89.     This cause of action is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons or entities who purchased Cano common stock in the Offering pursuant to the Offering Documents, against Cano, Defendant Johnson, Defendant Smith, Defendant Ricketts, and the Underwriter Defendants.

90.     Each of the defendants named in this Count was an offeror or seller of a security, specifically Cano common stock sold in the Offering.

91.     By means of the Offering Documents, defendants named in this Count offered and sold shares of Cano's common stock to Plaintiff and/or other members of the Class in return for proceeds in excess of $54 million.

92.     The actions of solicitations taken by defendants included participation in the preparation and dissemination of the false and misleading Offering Documents. Additionally, one or more of the defendants named herein participated in the acts detailed as follows:

(a)     They made the decision to conduct the Offering, to do it at the selected offering price and to make the sale in the United States. They actively and jointly drafted, revised, and approved the Offering Documents and other written selling materials by which the Offering was made to the investing public. These written materials were "selling documents" and calculated by these defendants to create interest in the securities offered and were widely distributed by defendants for that purpose;

(b)     They finalized the Offering Documents and/or caused the Offering Documents

to become effective. But for the defendants having signed and/or drafted the Offering Documents, the Offering could not have been made; and

(c)     They conceived and planned the Offering and together, jointly orchestrated all activities necessary to effect the sale of these securities to the investing public by issuing the securities, promoting the securities, and supervising their distribution and ultimate sale to the investing public.

93.     The Cano common stock offered and sold in the Offering by defendants named in this Count were offered and sold through the use of interstate communication, the use of interstate commerce, and the use of the mails.

94.     Cano common stock was offered and sold through the use of the Offering Documents, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

95.     Defendants named herein were obligated to make a reasonable and diligent investigation of the written statements made in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

96.     Plaintiff and other members of the Class purchased Cano securities pursuant to the defective Offering Documents. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

97.     Those plaintiffs who continued to own Cano securities offer to tender to Cano their holdings in return for the consideration paid for the securities together with interest thereon.

98.     By reason of the conduct alleged herein, each defendant violated § 12(a)(2) of the Securities Act. As a direct and proximate result of defendants' conduct, Plaintiff and the other members of the Class suffered substantial damage in connection with the purchase of the securities pursuant to the Offering Documents.

**THIRD CLAIM**
**For Violation of Section 15 of the Securities Act of 1933**
**Against the Officer Defendants and the Director Defendants**

99.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

100.    This cause of action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons or entities who purchased Cano common stock in the Offering pursuant to the Offering Documents, against the Officer Defendants and the Director Defendants.

101.    The defendants named in this Count were each control persons of Cano by virtue of their executive and/or directorial positions. The defendants named in this Count had the power, and exercised the same, to cause Cano to engage in the violations of law complained of herein, and were able to and did control the contents of the Offering Documents.

102.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and devoid of any omissions of material fact. By reason of their top executive positions at Cano and their actual control over the Company's day-to-day operations, financial statements, public filings and their involvement and control over the Offering Documents, each of the defendants named in this Count is jointly and severally liable to Plaintiff and the other members of the Class as a result of the wrongful conduct alleged herein.  The Officer Defendants and the Director Defendants are liable under Section 15 of the Securities Act for Cano's primary violations of Section 11 of the Securities Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of itself and members of the Class, prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and other members of the Class rescissionary damages with respect to their claims under Section 12(a)(2) of the Securities Act;

(d)      Awarding Plaintiff and other members of the Class their reasonable costs and expenses incurred in this litigation, including counsel fees and expert fees; and

(e)      Granting Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:      July 7, 2009                  Respectfully submitted,

By: _____
Roger F. Claxton
State Bar No. 0439000
LAW OFFICE OF ROGER F. CLAXTON
10,000 North Central Expressway, Suite 725
Dallas, Texas  75231
Tel: (214) 969-9029
Fax: (214) 953-0583
Email:  roger@claxtonlaw.com

Daniel Hume (admitted *pro hac vice* on June 19, 2009)
Ira M. Press (admitted *pro hac vice* on June 29, 2009)
Beverly Tse (admitted *pro hac vice* on June 19, 2009)
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th  Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: dhume@kmllp.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on July 7, 2009 by certified mail, return receipt requested to:

Charles A. Gilman, Esq.
Brian T. Markley, Esq.
CAHILL GORDON & REINDELL LLP
Eighty Pine Street
New York, NY  10005
Fax:  (212) 269-5420

Scott L. Davis, Esq.
Jeremy A. Williams, Esq.
GARDERE WYNNE SEWELL LPP
1601 Elm Street, Suite 3000
Dallas, TX  75201
Fax:  (214) 999-4851
Fax:  (214) 999-3511

John F. Batter, III, Esq.
WILMER CUTLER PICKERING HALE &
DORR LLP
60 State St.
Boston, MA  02102
Fax:  (617) 526-5000

Ralph H. Duggins, Esq.
Scott A. Fredricks, Esq.
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Fax:  (817) 877-2807

Jonathan J. Lerner, Esq.
Gregory A. Litt, Esq.
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036
Fax:  (212) 735-2000

Patrick Craine
Bracewell Giuliani
1445 Ross Avenue, Suite 3800
Dallas, TX  75202
Fax:  (214) 758-8348


Roger F. Claxton

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Michael E. Fein declares as follows:

1.     I am a Principal for the General Partner of Truk International Fund LP ("plaintiff").
As such, I am authorized to make this certification on plaintiff's behalf.

2.     I have previously reviewed and authorized the filing, on plaintiff's behalf, of the class
action complaint filed on October 2, 2008 on behalf of investors in Cano Petroleum, Inc.
("Cano") securities. Plaintiff has retained Kirby McInerney LLP, and such co-counsel as it
deems appropriate to associate with, to pursue such action on a contingent fee basis.

3.     Plaintiff did not purchase Cano securities at the direction of plaintiffs' counsel or in order
to participate in this private action.

4.     Plaintiff is willing to serve as a representative party on behalf of the class, including
providing testimony at deposition and trial, if necessary.

5.     Plaintiff's transactions in Cano securities during the class period set forth in the
complaint are set forth below on the attached Schedule A.

6.     I have become aware that the certification dated September 29, 2008 and the Schedule A
attached thereto ("September 29, 2008 Certification") that plaintiff previously submitted with the
complaint filed on October 2, 2008 did not include some of plaintiff's most recent sales of the
Cano securities that plaintiff purchased on June 26, 2008.   The Schedule A attached hereto
reflects the complete list of plaintiff's transactions in Cano securities including the more recent
transactions that were not listed in the September 29, 2008 Certification.

7.     During the three years prior to the date of this certification, plaintiff has not served or

sought to serve as a representative party, for a class in any action filed under the federal securities laws, except as noted on Schedule A.

8.    Plaintiff will not accept payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any class recovery, except as ordered/approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of December, 2008.

_Michael E. Fein_

Michael E. Fein

# SCHEDULE A

Transactions of Truk International Fund in Cano Petroleum, Inc.:

| Date | Purchase/Sale | No. of Shares | Price Per Share |
|------|---------------|---------------|-----------------|
| 6/26/08 | Purchase | 118,610 | $8.00 |
| 6/26/08 | Sale | 21,750 | $8.0476 |
| 6/27/08 | Sale | 899 | $8.1318 |
| 6/30/08 | Sale | 232 | $8.10 |
| 7/1/08 | Sale | 1,218 | $8.00 |
| 7/2/08 | Sale | 4,350 | $7.7591 |
| 8/11/08 | Sale | 16,124 | $2.9761 |
| 8/12/08 | Sale | 14,500 | $2.9088 |
| 8/13/08 | Sale | 30,537 | $2.761 |
| 8/14/08 | Sale | 145 | $2.85 |
| 8/20/08 | Sale | 11,455 | $3.1632 |
| 8/21/08 | Sale | 2,900 | $3.3901 |
| 8/22/08 | Sale | 29 | $3.35 |
| 8/25/08 | Sale | 2,900 | $3.0115 |
| 8/27/08 | Sale | 5,800 | $3.20 |
| 8/28/08 | Sale | 5,771 | $3.4402 |

Federal securities law class actions in which plaintiff has served or sought to serve as a representative party:

_____ NONE _____

_____

_____

_____