

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC - 3 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TRUK INTERNATIONAL FUND LP, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 4:09-CV-308-A |
| | § | |
| | § | |
| DAVID W. WEHLMANN, ET AL., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
and
ORDER

Before the court are two motions to dismiss the complaint,
as amended, of plaintiff, Truk International Fund LP, for failure
to state a claim upon which relief can be granted.  Defendants
Cano Petroleum, Inc. ("Cano"), David W. Wehlmann, S. Jeffrey
Johnson ("Johnson"), Morris B. Smith, Michael J. Ricketts, Ben
Daitch, Patrick McKinney, Randall Boyd, Donald W. Niemiec, Robert
L. Gaudin, and William O. Powell III filed one of the motions.
Defendants Canaccord Capital Corp. and Canaccord Adams, Inc.,
filed the other.[1]  Having considered the amended complaint, the
motions, defendants' memoranda in support thereof, plaintiff's
response, defendants' joint reply, and applicable legal

---

[1]The court refers to all defendants collectively as "defendants" in this opinion.

authorities, the court concludes that defendants' motions should be granted.

I.

### History of Action and
### Overview of Claims Alleged by Plaintiff

This action was initiated by the filing of a complaint on October 2, 2008, in the United States District Court for the Southern District of New York by plaintiff individually and on behalf of a putative class of investors who purchased Cano stock in a secondary public offering by which Cano sold seven million shares of common stock at $8 per share. Defendants Cano and Johnson were not named in the original complaint. The action was transferred to this court on June 1, 2009, by order granting the motion of certain defendants to transfer. On July 7, 2009, plaintiff filed the amended complaint making more detailed allegations and adding Cano and Johnson as defendants. The individual defendants are officers and/or directors of Cano. The Canaccord defendants are the underwriters of the offering.

Plaintiff complained of information provided in the following documents Cano used in the secondary public offering:

> [A] registration statement and prospectus on Form S-3
> filed on or about December 13, 2007 and declared
> effective by the SEC on December 28, 2007 (the
> "Registration Statement"), a preliminary prospectus

supplement filed on or about June 25, 2008 on Form
424B3 (the "Preliminary Prospectus"), and a final
prospectus supplement filed with the SEC on or about
June 26, 2008 on Form 424B5 (the "Prospectus")
(collectively, the "Offering Documents").[2]

Am. Compl. at 2, ¶ 2.  According to plaintiff, the Offering

Documents contained "material misrepresentations and

misstatements of fact," in violation of sections 11, 12, and 15

of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

§§ 77k, 77l, 77o (2006).  Id.

Cano is an independent oil and natural gas company that uses

enhanced recovery methods to produce oil and gas from several

fields located in southwest United States in which Cano has

ownership interests.  All of plaintiff's claims relate to the

quality of information contained in the Offering Documents

pertaining to Cano's "proved reserves," which is oil industry

jargon for the estimated quantity of reasonably recoverable oil

and gas in mineral properties.[3]  According to plaintiff, "[t]he

primary driver of market valuations of oil/gas production

―――――――――――――――――――――

[2]The court uses in this memorandum opinion the same shorthand references used by plaintiff in
the quoted language.

[3]The Prospectus defined "proved reserves" as "[t]he estimated quantities of crude oil, natural gas
and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be
recoverable in future years from known reservoirs under existing economic and operation conditions."
Cano App. at 69.

companies like Cano is the amount of oil/gas reserves claimed

. . . ." Id. at 13, ¶ 38.

Plaintiff alleged that Cano overstated its proved reserves

in the Offering Documents by a total of 17.73 million barrels of

oil equivalent ("BOE"). Three of Cano's properties were alleged

to be the subjects of material overstatements--the Panhandle,

Desdemona, and Pantwist properties. Plaintiff alleged that, as

to those properties, the proved reserves as stated in the

Offering Documents, the proved reserves as restated, reduced, and

corrected after the offering, and the overstatements (all stated

in millions of barrels of BOE) were as follows:

| Property | Per the Prospectus | Correct | Over-Statement |
|----------|--------------------|---------|----------------|
| Panhandle | 35.547 | 30.100 | 5.447 |
| Desdemona | 11.851 | 4.000 | 7.851 |
| Pantwist | 6.829 | 2.400 | 4.429 |

Id. at 3-4, ¶ 6; 21, ¶ 54.[4]

Plaintiff complained that on July 23, 2008, about one month

after the offering was accomplished in June 2008, Cano, acting

through Johnson, Cano's chief executive officer, announced that

---

[4]Plaintiff alleged that the proved reserves as to two other Cano properties were overstated in de minimis amounts and that the proved reserves as to two more were understated, one by a rather significant amount. Am. Compl. at 4, ¶ 6. As both parties focus on the Panhandle, Desdemona, and Pantwist properties, the court does as well.

Cano's proved reserves had declined as of June 30, 2008, from 66.7 million BOE to 53.2 million BOE, a reduction of roughly twenty percent from the amount that was reported in the Prospectus.  Johnson made specific reference to declines in the Panhandle, Desdemona, and Pantwist properties.  Those announcements, according to plaintiff, caused Cano's share price to fall "sharply and immediately" to $3.73 on July 24, 2008.  Id. at 22, ¶ 58.  Cano's share price has continued to decline since that date.

II.

Grounds of the Motions and
Plaintiff's Response

A.    Grounds of the Motions

Defendants' motions are grounded on the following contentions:

1.    As a matter of law, the Offering Documents made adequate disclosure that the estimates of proved reserves at the time of the secondary offering could be less than the estimates of proved reserves stated as of June 30, 2007, in the Offering Documents.

2.    Plaintiff failed adequately to allege that any alleged misstatement or omission in the Offering Documents was material.

3.    As a matter of law, the alleged misstatements and omissions were immaterial when viewed in the light of specific warnings contained in the Offering Documents.

4.    Plaintiff failed adequately to allege facts in the amended complaint to support a plausible basis for plaintiff's claims.

5.    Plaintiff failed to meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

B.    Plaintiff's Response

Plaintiff responded that:

1.    The Offering Documents materially misrepresented the Panhandle proved reserves as of June 2007.

2.    The statements made in the Offering Documents concerning Desdemona and Pantwist were materially misleading.

3.    The warnings in the Offering Documents that the statements therein of proved reserves as of June 2007 could be in error were insufficient considering that defendants knew when the Offering Documents were published that the June 2007 estimates of

proved reserves were materially greater than what the proved
reserves actually were at the time of the offering.

      4.   The allegation that the price of Cano's shares
declined following Cano's July 23, 2008, announcement was
sufficient to support the allegation that the warnings in the
Offering Documents were not adequate.

III.

Contents of Documents Other than the Amended
Complaint that are to be Considered
by the Court in Deciding the Motions to Dismiss

When considering the motions to dismiss, the court is to
consider, in addition to the allegations of the complaint, the
full text of documents partially quoted in the complaint, and the
contents of relevant disclosure documents required to be filed
with the SEC, see In re CompUSA, Inc. Sec. Litig., No. 3:94-CV-
1151, 1995 WL 811960, at *2 & n.2 (N.D. Tex. Oct. 30, 1995); the
contents of documents integral to the complaint, see In re Sec.
Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 882 (S.D. Tex.
2001); and, documents actually filed with the SEC, see R2 Invs.
LDC v. Phillips, 401 F.3d 638, 639 n.2 (5th Cir. 2005), even if
they are not mentioned in the complaint, see In re Sec. Litig.
BMC Software, Inc., 183 F. Supp. 2d at 883-84. The facts
discussed below in this section of the memorandum opinion, none

7

of which are in dispute, are disclosed in one or more of the
documents the court is to consider in deciding the motions.

A.     The Estimates of Proved Reserves as of June 30, 2007

An independent petroleum engineering firm reported its
estimates of Cano's proved reserves as of June 30, 2007, and Cano
presented them publicly on July 17, 2007.  Cano's App. at 148,
154.  The overall estimate of 66.7 million BOE as of June 30,
2007, included an estimate of 35.5 million for the Panhandle
property, 6.8 million for Pantwist, and 11.9 million for
Desdemona, of which 6.8 million were attributed to a program in
the Barnett Shale.  See id. at 148, 155-56.  These are the
estimates that were reported in the Offering Documents about
which plaintiff complains.

B.     The Comment Letters Issued by the SEC Between June 30,
       2007, and June 30, 2008

The staff of the Securities and Exchange Commission ("SEC")
regularly provides comments to public companies to be taken into
account in their filings.  Id. at 210.  Since 2004 the SEC has
routinely allowed public access to those comments not less than
forty-five days after the SEC staff completes its review.  Id.
The comments, typically in the form of letters to particular
companies, "set forth staff positions on a particular filing only

and do not constitute an official expression of the Commission's views" and "are limited to the specific facts of the filing to which they apply, and do not apply to other filings."  Id.

In a comment letter dated July 9, 2007, the SEC staff, after having reviewed a recent filing by Parallel Petroleum Corporation ("Parallel"), told Parallel that it should limit estimates of proved undeveloped reserves from future horizontal wells in the Barnett Shale to two parallel offset wells to each productive horizontal well.  Id. at 216.  On March 5, 2008, the SEC staff directed a comment letter to Edge Petroleum Company advising it to exclude from its proved reserves properties it did not intend to develop within five years, unless the company could justify a longer period.[5]  Id. at 220.

C.    Cautionary Language in the Offering Documents

The Offering Documents warned the readers that the actual quantities and values of proved reserves could be less than the estimates of reserves stated in the documents as of June 30,

---

[5]As part of plaintiff's pleaded claim that the Pantwist reserve estimates were false, plaintiff relied on what it referred to as "long-extant regulatory standards."  Am. Compl. at 6, ¶ 8(c).  In its response to the motions to dismiss, plaintiff in effect acknowledged that the "standards" to which it referred actually were the contents of SEC staff letters identical to the March 5, 2008, letter from SEC to Edge Petroleum Corp., which is in Cano's appendix at 219-221, that had been made public since September 2007.  Pl.'s Resp. & Br. in Opp'n at 8.

2007.  The Registration Statement contained the following

cautionary language:

> **The actual quantities and present value of our proved reserves may be lower than we have estimated.**
>
> This prospectus incorporates by reference estimates of our proved reserves.  The process of estimating oil and natural gas reserves is complex. The process involves significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir.  Therefore, these estimates are inherently imprecise.  Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves most likely will vary from these estimates and vary over time.  Such variations may be significant and could materially affect the estimated quantities and present value of our proved reserves.  In addition, we may adjust estimates of proved reserves to reflect production history, results of exploration and development drilling, results of secondary and tertiary recovery applications, prevailing oil and natural gas prices and other factors, many of which are beyond our control.
>
> **Approximately 87% of our total proved reserves as of June 30, 2007 consist of undeveloped and developed non-producing reserves, and those reserves may not ultimately be developed or produced.**
>
> Approximately 83% of our total proved reserves as of June 30, 2007 are undeveloped and approximately 4% are developed non-producing.  While we plan to develop and produce all of our proved reserves, these reserves may not ultimately be developed or produced. Furthermore, not all of our undeveloped or developed non-producing reserves may be ultimately produced at the time periods we have planned, at the costs we have budgeted, or at all.  Estimated development costs for

our proved undeveloped reserves are approximately
$325,000,000 as of June 30, 2007.

Id. at 85-86.

The prospectus supplement, which accompanied the Prospectus,
cautioned on its first page that "*[y]ou should carefully consider
each of the risk factors described under 'Risk Factors' beginning
on page S-7 of this prospectus supplement and page 7 of the
accompanying prospectus.*" Id. at 3. Under the heading "RISK
FACTORS" on page S-7 of the prospectus supplement, the readers
are warned:

> *Our proved undeveloped reserves may decline in response
> to recent Securities and Exchange Commission guidance.*
>
> This prospectus incorporates by reference
> estimates of our proved reserves as of the fiscal year
> ended June 30, 2007. Based on recent guidance
> regarding the appropriate method for calculating proved
> undeveloped reserves provided in publicly available
> comment letters issued by the Securities and Exchange
> Commission to certain companies, currently, we expect
> that our proved undeveloped reserves for the fiscal
> year ending June 30, 2008 may decrease.

Id. at 12. And, the Prospectus itself warned "*[y]ou should
carefully consider each of the risk factors described under "Risk
Factors" beginning at page 7 of this prospectus,*" id. at 25, and
then repeated under the "Risk Factors" heading the same warnings
given to the readers concerning the estimates of proved reserves

11

that were contained in the Registration Statement, as quoted

above, id. at 35-36.

D.    The Disclosure of the Estimates of Proved Reserves Made
      as of June 30, 2008

During the July 23, 2008, conference call on which plaintiff

relies in its amended complaint, Am. Compl. at 21-22, ¶¶ 54-57,

Cano announced the results of the report made by a new

independent petroleum engineering firm that estimated proved

reserves as of June 30, 2008, Cano App. at 179, 199.  The report

gave an estimate of proved reserves as of June 30, 2008, of 53.2

million BOE, compared to the 66.7 million BOE estimate the other

engineering firm had reported as of June 30, 2007.  Id. at 179.

The decrease resulted primarily from reclassification of reserves

from proved undeveloped reserves to probable reserves at the

Panhandle, Desdemona, and Pantwist properties.  Id. at 191, 201.

During the conference call, Johnson said that proved undeveloped

reserves at Desdemona were reduced due to a decision to use a

maximum of two offsetting locations for each producing well in

the Barnett Shale, consistent with the SEC comment letter to

Parallel, id. at 201; that the proved undeveloped reserves

attributable to the leases in the Granite Wash formation in

Panhandle had to be reclassified as probable reserves "until

12

[Cano] start[s] to inject in that formation," Am. Compl. at 23, ¶ 62; and, that as to Pantwist Cano no longer had immediate plans to develop the project, id. at 27, ¶ 76.

In Cano's Form 10-K for the fiscal year ended June 30, 2008, Cano explained that "[t]he decrease in total proved reserves was primarily driven by revisions to [Cano's] five-year development plan based on current industry practice that placed many reserves outside the window of allowed proved reserves classification and reduced the allowed [proved undeveloped] locations booked per [proved developed producing] location."[6]  Cano App. at 188-89.

IV.

## Applicable Motion to Dismiss Principles

Rule 8(a)(2) of the Federal Rules of Civil Procedure, which provides in a general way the applicable standard for pleading, requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal

---

[6]In so many words, Cano explained that a cause of the decline in the estimates of proved reserves was the decision of the petroleum engineering firm who reported the estimated proved reserves as of June 30, 2008, to apply to Cano the comments SEC staff had made in the comment letters directed to other companies.

quotation marks and ellipsis omitted).  Although a complaint need

not contain detailed factual allegations, the "showing"

contemplated by Rule 8 requires the plaintiff to do more than

simply allege legal conclusions or recite the elements of a cause

of action.  Twombly, 550 U.S. at 555 & n.3; see also Kapps v.

Torch Offshore, Inc., 379 F.3d 207, 210 (5th Cir. 2004) (stating

in a section 11 case that "mere conclusory allegations will not

suffice to prevent a motion to dismiss").  Thus, even though a

court must accept all of the factual allegations in the complaint

as true, a court need not credit bare legal conclusions that are

unsupported by any factual underpinnings.  See Ashcroft v. Iqbal,

556 U.S. ---, 129 S. Ct. 1937, 1950 (2009) ("While legal

conclusions can provide the framework of a complaint, they must

be supported by factual allegations.").

Not only must a complaint plead facts instead of

conclusions, but the facts pleaded must allow the court to infer

that the plaintiff's right to relief is plausible.  Iqbal, 129 S.

Ct. at 1950; Twombly, 550 U.S. at 556-57.  To allege a plausible

right to relief, the facts pleaded must actually suggest

liability; allegations that are merely consistent with unlawful

conduct are insufficient.  Twombly, 550 U.S. at 566-69 (holding

that allegations of parallel market behavior, though consistent

with an antitrust conspiracy, did not state a plausible claim

because other, as likely, explanations for defendant's parallel

behavior existed).  "Determining whether a complaint states a

plausible claim for relief . . . [is] a context-specific task

that requires the reviewing court to draw on its judicial

experience and common sense." Iqbal, 129 S. Ct. at 1950.

As a supplement to Rule 8(a)(2), Rule 9(b) of the Federal

Rules of Civil Procedure requires that parties alleging fraud

state with particularity the circumstances constituting the

fraud.  In the securities fraud context, this requires plaintiffs

to specify the alleged misrepresentations, identify the speaker,

state when and where the statements were made, and set forth

facts indicating why the representations were misleading.

Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d

353, 362 (5th Cir. 2004).

V.

Principles Applicable to Claims Under
Sections 11, 12, and 15 of the Securities Act

Section 11 of the Securities Act provides purchasers of a

registered security a private right of action against the parties

who play a direct role in the registered offering when false or

misleading information is included in a registration statement.[7]

15 U.S.C. §§ 77k(a).  The requirements to state a claim under

section 12 are similar to the section 11 requirements except that

section 11 applies to misrepresentations and omissions in a

registration statement, id. § 77k, whereas section 12 applies to

misrepresentations and omissions in a prospectus, id. § 77l.

Section 15 of the Securities Act has to do with controlling

person liability for violations of sections 11 and 12.  Id.

§ 77o.

---

[7]In pertinent part, section 11 of the Securities Act reads as follows:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1)    every person who signed the registration statement;

(2)    every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

. . .

(5)    every underwriter with respect to such security.

15 U.S.C. § 77k(a).

16

The elements of a claim under sections 11 and 12 of the
Securities Act are "(1) an omission or misrepresentation, (2) of
a material fact required to be stated or necessary to make other
statements made not misleading." Krim v. BancTexas Group, Inc.,
989 F.2d 1435, 1445 (5th Cir. 1993). "[A] 'material' fact is one
which a reasonable investor would consider significant in the
decision whether to invest, such that it alters the 'total mix'
of information available about the proposed investment." Id.
Put another way, information allegedly omitted or misrepresented
is not "material" unless a reasonable investor viewing the
information in the context of the Offering Documents as a whole
would have considered the investment significantly more risky as
a result. Id. at 1446, 1448; see also Kapps, 379 F.3d at 214.
Statements in an offering document have to be "read in context
with the prospectus as a whole" in determining whether it is
materially misleading. Kapps, 379 F.3d at 211. "[T]he definition
of materiality developed under the federal securities laws
contemplates a showing of a substantial likelihood that, under
all the circumstances, the omitted facts would have assumed
actual significance in the deliberations of the reasonable
investor." Id. at 1448 (internal quotation marks, brackets, and
footnote omitted).

17

A determination of materiality takes into account cautionary statements made in the Offering Documents. Klein v. Gen. Nutrition Co., Inc., 186 F.3d, 338, 342 (3d Cir. 1999). A warning or cautionary statement in an offering document can defeat what otherwise would appear to be a viable claim. Id. at 344; In Re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993). "[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." Id. at 371; see also Kapps, 379 F.3d at 214-15 (recognizing that cautionary statements must be taken into account in determining whether a reasonable investor would have been materially misled); Klein, 186 F.3d at 342; I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991); Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 325 (D.N.J. 2000); Schoenhaut v. Am. Sensors, Inc., 986 F. Supp. 785, 792-93 (S.D.N.Y. 1997); Zucker v. Quasha, 891 F. Supp. 1010, 1014 (D.N.J. 1995).

In Krim, the Fifth Circuit included as an essential element of an omission claim under sections 11, 12, and 15 that "the information allegedly omitted from the Prospectus was known to the issuer at the time the Prospectus was distributed." 989 F.2d at 1445. Whether knowledge by the issuer of a material omitted

18

fact is an element of such a claim has been a subject of disagreement among the courts.  See, e.g., Hutchison v. CBRE Realty Fin., Inc., 638 F. Supp. 2d 265, 273-75 (D. Conn. 2009).[8] The Supreme Court has used language indicating that a cause of action exists even if the issuer did not know, or have reason to know, of the omitted fact.  See Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).[9]

"Issuers are not guarantors of the investments they sell. All investment carries risk.  A loss, standing alone, does not give rise to a claim under the federal securities law."  Krim, 989 F.2d at 1450.

---

[8]While the court's ruling on the motions to dismiss would be the same whether or not knowledge is considered to be an element of an omission claim, the court notes that if knowledge is an element, there is a stronger case for granting the motions.

[9]The court is inclined to think that Krim can be reconciled with Huddleston on the ground that Krim dealt with omissions related to future performance, which quite logically would require that the issuer know, or have reason to know, of the falsity of the forecast before being held accountable. "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal security laws." Krim, 989 F.2d at 1446 (citations, internal quotation marks, and brackets omitted).

VI.

Analysis

A.    A More Detailed Description of Plaintiff's Pleaded
      Claims

The allegations under the heading "Nature of the Action and

Overview" on pages 1-7 of the amended complaint provide a rather

complete summary of plaintiff's claims, which are described in a

general way in section I of this Memorandum Opinion.  Plaintiff's

allegations provide the following particularization of its claims

directed specifically to the reserve estimates as to the

Desdemona, Panhandle, and Pantwist properties:

> 7.    The Offering Documents purported to contain
> various warnings as to proved reserves generally and
> the proved reserve figures stated in the
> Prospectus. . . .

> 8.    The [warning] statements were themselves
> inadequate and misleading.  It was not merely the case
> that Cano's proved reserves *could* vary (an empty
> truism), or "*may* decline in response to recent [SEC]
> guidance" (emphasis added).  Rather, Defendants knew or
> should have known, but did not disclose, that Cano's
> proved reserves were, at the time of the Offering,
> *materially less* than the reserve figures contained in
> the Offering Documents:

> (a)    In Cano's Desdemona property, with a
> purported 11.851 million BOE of proved reserves, the
> lion's share of purported proved reserves (11 million
> BOE) consisted of natural gas from the Barnett Shale.
> Unbeknownst to Plaintiff and the Class, Cano's stated
> 11 million BOE of Barnett Shale gas reserves resulted
> in large part from the practice of booking, in *addition*

20

to the gas found in an actually-drilled well, like amounts of gas from *eight additional, adjacent 'theoretical' wells that could be drilled*. However, *nearly one year prior to the Offering*, in July 2007, the SEC ruled that proved reserves in the Barnett Shale could only be booked *for two such adjacent wells, rather than eight*. Defendants therefore knew, long prior to the Offering, that the proved reserve figures stated in the Offering Documents for Desdemona (and therefore Cano as a whole) were highly overstated. Defendants knew not merely that reserves could "vary" or "may decline" from the figures provided in the Offering Documents, but rather that reserves in fact were far lower than stated in the Prospectus, and would in fact materially decline when reported almost immediately after the offering (Cano's new reserve report was to be dated as of June 30, 2008 -- just four days after the offering). One month after the Offering, defendants admitted the foregoing, materially reducing Desdemona's proved reserves from 11.851 million BOE to only 4 million BOE. The largest part of that 7.851 million reduction -- 6 million BOE -- resulted from Cano's belated recalculation of reserves in response to year-old SEC guidance to book reserves from only two rather than eight offset locations.

      (b)  In Cano's Panhandle property, with a purported 35.547 million BOE of proved reserves, approximately 30.1 million BOE stemmed from a geological formation known as the Brown Dolomite and the remaining purported 5 million BOE from a distinct and separate geological formation known as the Granite Wash. Although Cano's operations in the Panhandle had focused exclusively on Brown Dolomite areas, unbeknownst to Plaintiff and the Class the proved reserve figures that Defendants provided in the Offering Documents included 5 million BOE from the Granite Wash -- in the absence of operations or any operational data for the latter formation. Relevant regulations, industry standard practice, and even Cano's stated standards for booking proved reserves only allow the booking of proved reserves in distinct, physically separate formations (here, the Granite Wash)

only where there is "certainty that there is continuity
of production from the existing productive formation"
and only when "actual tests in the area and in the same
reservoir" so demonstrate.  Here, Cano's lack of
operations in and operational data from the Granite
Wash formation made it clear, or should have made it
clear, to Defendants *ab initio*, long before the
Offering, that the 5 million BOE of purported proved
reserves claimed for the Granite Wash formation, were
without basis in fact, and violated long-standing
regulatory standards as well as Cano's own purported
standards for booking proved reserves.  Therefore,
Defendants knew or absent negligence should have known
not merely that reserves could "vary" or "may decline"
from the figures provided in the Offering Documents,
but rather that reserves in fact were far lower than
stated in the Prospectus.  One month after the
Offering, defendants belatedly so admitted, materially
reducing Panhandle proved reserves from 35.547 million
BOE to only 30.1 million BOE, with the effective
entirety of the 5.4 million BOE reduction arising from
the erasure of "proved" reserves from the Granite Wash
formation.

        (c)   In Cano's Pantwist property, of the
purported 6.3 million BOE of ostensibly proved
reserves, 4.95 million BOE were proved *undeveloped*
reserves.  Analogously to ¶ 8(b) *supra*, these proved
undeveloped reserves violated long-extant regulatory
standards as well as Cano's own purported standards for
booking proved reserves.  Defendants themselves had
long stated that they had no near-term intention to
develop claimed proved reserves in Pantwist to
actually-producing sites, and in the months prior to
the Offering Defendants became aware that Cano's
capital expenditures would have to be constrained to
more promising properties both in the short term and
the longer term.  Put simply, Defendants knew and/or
become aware prior to the Offering that Cano could and
would do nothing with Pantwist for the foreseeable
future -- which meant that claiming proved undeveloped
reserves for the property was contrary to regulatory
standards and Cano's stated standards.  Therefore,

prior to the Offering, Defendants knew or absent
negligence should have known not merely that reserves
could "vary" or "may decline" from the figures they
provided in the Offering Documents, but rather that
reserves in fact were far lower than stated in the
Prospectus. One month after the Offering, defendants
belatedly so admitted, reducing Pantwist proved
reserves from 6.3 million BOE to only 2.4 million BOE -
- with the effective entirety of the 4 million BOE
reduction arising from the erasure of almost all of
Pantwist's purported proved undeveloped reserves.
Defendants also then revealed that rather than spend
the funds to develop Pantwist, they would instead seek
to sell off Pantwist to raise funds to develop other
properties.

Am. Compl. at 4-7, ¶¶ 7-8 (footnote omitted).

B.    The Cautionary Statements Cause All the Alleged
      Misrepresentations and Omissions to be Immaterial

The cautionary statements in the Offering Documents made

clear that the proved reserve numbers stated in the documents

were estimates as of June 30, 2007, and that a large number of

factors could cause the estimates to be lower if recalculated as

of the date of the offering.  The speculative and uncertain

nature of the formulation of estimates of proved reserves was

conveyed in the documents by the warnings that "[t]he process of

estimating oil and gas reserves is complex," Cano App. at 35,

that "these estimates are inherently imprecise," id., that

"[a]ctual future production, oil and natural gas prices,

revenues, taxes, development expenditures, operating expenses and

quantities of recoverable oil and natural gas reserves most
likely will vary from these estimates and vary over time," id. at
35, 85, and that "[s]uch variations may be significant and could
materially affect the estimated quantities and present value of
[Cano's] proved reserves," id. at 36, 86.  And, the readers were
specifically warned that the reserves could decline in response
to recent SEC guidance.  Id. at 12.

There is no allegation in the amended complaint that Cano
misrepresented the proved reserve estimates provided to it by the
independent petroleum engineer's report as of June 30, 2007.
Rather, the pleaded contentions center on reductions in the
estimates of proved reserves reported by a different petroleum
engineer as of June 30, 2008.  Plaintiff's claims are based
strictly on alleged omissions--Cano's failure to disclose in the
Offering Documents factors that led to the lower estimates of
proved reserves stated in the report prepared by the new
petroleum engineer as of June 30, 2008.  Virtually every one of
those factors was disclosed, at least in a general way, in the
cautionary language as being one that could lead to a reduction
in the estimates of proved reserves.

The amended complaint does not contain an allegation that
Cano knew at the time of the publication of the Offering

24

Documents what the new petroleum engineer would estimate the proved reserve quantity to be.  Nor is there an allegation that the petroleum engineer who prepared the report as of June 30, 2008, had reached a conclusion as of the date of the offering as to what effect the factors mentioned in the amended complaint would have on the estimate to be made as of June 30, 2008.  See Zucker, 891 F. Supp. at 1017 (saying that, "[i]n order to prevail, a plaintiff must show that the omitted information in fact existed at the time that the allegedly misleading statement was made").  Cano was not required to provide speculation in the Offering Documents as to the estimated quantities of proved reserves the new petroleum engineer would put in the report he was to prepare or the factors the new engineer would take into account in arriving at his estimates.

Adopting the language used by the Second Circuit in I. Meyer Pincus & Associates v. Oppenheimer & Co., "[t]he statements contained within the prospectus clearly 'bespeak caution' rather than encouraging optimism."  936 F.2d at 763.  As did the Second Circuit, this court declines to impose liability on such a basis. The court agrees with the case authority that "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could

consider them important in light of adequate cautionary language set out in the same offering." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004). In the light of the cautionary language in the Offering Documents, a reasonable investor would not have given significant weight in the investment decision to differences in the reserve estimates disclosed in the Offering Documents as of June 30, 2007, and the estimates reported as of June 30, 2008. A reasonable investor would have recognized the speculative and uncertain nature of the formulation of estimates of proved reserves and would not have considered investment in Cano significantly more risky if the investor had been informed that a currently prepared estimate of reserves would report the estimated reserves to be twenty percent less than they had been reported to be as of June 30, 2007. Such an investor would have considered an investment in Cano to be speculative no matter which number was used as an estimate of proved reserves.

Plaintiff's allegations that Cano's stock price fell "sharply and immediately" to $3.73 following the disclosure of Cano's new, lower reserve estimates do not move the plaintiff closer to stating a claim. Am. Compl. at 7, ¶ 9. First, the court notes that Cano stock closed at $5.40 per share at July 22, 2008, meaning that, contrary to the implication in plaintiff's

26

complaint, Cano's stock did not tumble all the way from the offering price of $8 per share to $3.73 per share following disclosure of the new reserve estimates.[10]  Although a drop in value from $5.40 per share to $3.73 per share theoretically could be caused by a recalculation of proved reserves, it could also be caused by, and, indeed, more likely was caused by falling oil prices at the time or the faltering economy generally.  Moreover, a two-day decline of only $1.67 per share could owe to nothing more than the vicissitudes of the stock market.  In other words, although the drop in Cano's stock price following the disclosure of the decrease in reserves is consistent with that decrease being material, it does not <u>suggest</u> that the decrease was material.  See <u>Geiger v. Solomon-Page Group, Ltd.</u>, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) (holding that evidence of stock price decline was not sufficient, by itself, to demonstrate materiality of omission from prospectus).  Thus, even considering the drop in Cano's stock price, the allegations in plaintiff's complaint still stop short of the line between possibility and plausibility.  See <u>Twombly</u>, 550 U.S. at 557.

---

[10]On a motion to dismiss, a court may take judicial notice of publicly reported stock prices, <u>see</u> <u>Catogas v. Cyberonics, Inc.</u>, 292 F. App'x 311, 316 (5th Cir. 2008), and broader market and economic conditions, <u>see</u> <u>In re Merrill Lynch & Co. Research Reports Sec. Litig</u>, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (taking judicial notice of the existence of the internet bubble and its subsequent crash), without converting the motion to a motion for summary judgment.

Summed up, a reasonable investor would know from reading the cautionary language in the Offering Documents that an investment in Cano was risky and that a part of that risk was in the uncertainty as to the quantity of proved reserves. The fact that the investment did not pay off "standing alone, does not give rise to a claim under the federal securities laws." Krim, 989 F.2d at 1450. For the reasons discussed, the court concludes that plaintiff failed to state a claim upon which relief can be granted and that, therefore, defendants' motions to dismiss are meritorious.

C.  The Court Does Not Need to Resolve the Rule 9(b) Dispute

Because the court concludes that plaintiff's amended complaint fails to satisfy the pleading standard set forth in Rule 8(a)(2), as explained in Twombly and Iqbal, the court will not discuss the applicability of Rule 9(b) or whether plaintiff's claims are "grounded in fraud." See Melder v. Morris, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994).

D.  Whether Plaintiff Should Be Allowed to Replead

In the body of its response to defendants' motions, plaintiff made a tentative request to be permitted to amend its complaint in the event that the court decided to dismiss.

28

Defendants objected to this request in their joint reply.
Plaintiff, though it has known of the deficiencies in its
complaint since the motions to dismiss were filed in July 2009,
has not filed a motion for leave to amend.  Nor has plaintiff
suggested any allegations it would make if permitted to amend the
complaint in an attempt to cure its pleading deficiencies.

The tentative request to amend is tucked in footnote 6 on
page 11 of the document titled "Plaintiff's Response and Brief in
Opposition to Defendants' Motions to Dismiss."  While the local
rules of this court authorize a document to contain more than one
motion, "[a]ny such document must clearly identify each included
. . . motion . . . in its title."  Rule LR 5.1(c) of the Local
Civil Rules of the United States Dist. Ct. for the N.D. of Tex.
Therefore, the footnote cannot be treated as a motion.  Moreover,
even if the court were to treat plaintiff's footnoted tentative
request as a motion for leave to amend, it nevertheless would be
ineffective because of noncompliance with Rule LR 15.1(a) of the
Local Civil Rules, which requires any motion for leave to amend
to be accompanied by the proposed amended complaint.

Rule 15(a)(2) of the Federal Rules of Civil Procedure states
that a court "should freely give leave [to amend] when justice so
requires."  Fed. R. Civ. P. 15(a)(2).  The court concludes that

justice does not require allowing plaintiff to replead in this

case.  See, e.g., Klein, 186 F.3d at 346 (taking into account in

the denial of leave to amend the lapse of time without a request

to amend and that, instead of seeking leave to file an amended

complaint, the plaintiffs chose to respond to the motion to

dismiss); Zucker, 891 F. Supp. at 1019 (including as reasons for

denying a request to amend that the request was not properly

before the court by way of a notice of motion and that plaintiff

had not submitted a copy of the proposed amended complaint in

accordance with a local rule).  Finally, the nature of the

pleading deficiencies suggest that repleading would be futile.

Consequently, defendants should not be subjected to any further

costs of litigation.

VI.

Order

Therefore,

For the reasons discussed above,

The court ORDERS that defendants' motions to dismiss be, and

are hereby, granted, and that all claims brought by plaintiff

30

against defendants be, and are hereby, dismissed.

     SIGNED December 3, 2009.

JOHN McBRYDE
United States District Judge